## In re Anonymous No. 21 D.B. 81

Disciplinary docket no. 21 D.B. 81.

McDONNELL, *Chairman,* May 14, 1983—

### A BRIEF SUMMARY OF THE CASE

[Respondent], a practicing attorney of the Commonwealth, represented [A], a prisoner in the [  ] County Jail, in a proceeding before Judge [I] of the [  ] Court of Common Pleas which resulted in an order dated August 6, 1980, transferrring [A] to [  ] State Hospital for medical examination and treatment.

On August 18, 1980, respondent, with [B], father of said [A], appeared at the hospital, on the Psychiatric Ward, to see said [A]. During the subsequent hour, certain events took place involving respondent, [B], [A], Dr. [C], Superintendent of the hospital, Dr. [D], Staff Psychiatrist on the Ward, Nurse [E], Psychiatric Aide, and security personnel. At the end of said period of time, respondent, [B] and [A], all left the hospital.

The first issue is whether or not respondent ordered the representatives of the hospital to release [A], or removed or assisted [B] in removing [A] from the hospital, without the knowledge, permission or consent of the court and in violation of the aforementioned court order. The hearing committee has determined that respondent did not order the representatives of the hospital to release [A]; nor, did he remove or assist [B] in removing [A] from the hospital.

Respondent went with [B] and [A] to see the family doctor and then took [A] to the [ ] Psychiatric Institute where the father signed the papers necessary for the admission of [A] to said hospital. The following day, August 19, 1980, respondent, with [B], went to the [ ] County Courthouse and ultimately appeared before [F], President Judge of [ ] County Court of Common Pleas. A hearing, the nature of which was not disclosed to respondent, took place with testimony being recorded and the district attorney being present. The issue raised as a result of the events which took place in said hearing is whether or not respondent lied to Judge [F] and/or attempted to mislead him. The hearing committee has determined that respondent, when asked about the whereabouts of [A], lied and attempted to mislead the court when he replied, "As far as I know, he's in [ ] State Hospital." Said conduct on the part of respondent constituted a violation of Disciplinary Rule 1-102(A)(4): A lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation; and a violation of Disciplinary Rule 1-102(A)(5): A lawyer shall not engage in conduct that is prejudicial to the administration of justice.

However, the hearing committee has also determined that the other statements made by respondent in the hearing aforesaid did not constitute lies or attempts to mislead the court. In the mind of respondent those statements were true.

Finally, after a second hearing, designated a probable cause hearing held during the afternoon of August 19, 1980, said Judge [F] of the [ ] Court of Common Pleas issued an order directed to respondent to produce [A] to the [ ] County Prison no later than 7:00 pm on August 19, 1980, and suspending the privilege of said respondent to practice

law in the [ ] Judicial District of Pennsylvania. It was stipulated that respondent failed to effect the return of [A] to the [ ] County Prison by 7:00 pm August 19, 1980. The third issue is whether or not respondent's failure to do so constituted a violation of a Disciplinary Rule of the Code of Professional Responsibility. The hearing committee concludes that it did not.

## A CONCISE STATEMENT OF THE CASE

The petition for discipline filed to No. 21 D.B. 81 against respondent, [ ], Esq., avers that respondent, by his conduct during the events of August 18, 1980, and August 19, 1980, has violated the following (11) Disciplinary Rules of the Code of Professional Responsibility:

D.R. 1-102(A)(3): A lawyer shall not engage in illegal conduct involving moral turpitude;

D.R. 1-102(A)(4): A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

D.R. 1-102(A)(5): A lawyer shall not engage in conduct that is prejudicial to the administration of justice;

D.R. 1-102(A)(6): A lawyer shall not engage in any other conduct that adversely reflects on his fitness to practice law;

D.R. 7-102(A)(3): In his representation of a client, a lawyer shall not conceal or knowingly fail to disclose that which he is required by law to reveal;

D.R. 7-102(A)(4): In his representation of a client, a lawyer shall not knowingly use perjured testimony or false evidence;

D.R. 7-102(A)(5): In his representation of a client, a lawyer shall not make a false statement of law and fact;

D.R. 7-102(A)(7): In his representation of a client, a lawyer shall not counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent;

D.R. 7-102(A)(8): In his representation of a client, a lawyer shall not knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule;

D.R. 7-106(A): A lawyer shall not disregard or advise his client to disregard a standing rule of a tribunal or a ruling of a tribunal made in the course of a proceeding, but he may take appropriate steps in good faith to test the validity of such rule or ruling; and,

D.R. 7-106(C)(6): In appearing in his professional capacity before a tribunal, a lawyer shall not engage in undignified or discourteous conduct which is degrading to a tribunal.

## FINDINGS OF FACT

1. Respondent is [   ] Esq., an attorney admitted to practice law in the Commonwealth of Pennsylvania (Paragraph 2 of Petition for Discipline admitted in Answer).

2. [A] was a defendant in criminal proceeding No. [   ] and No. [   ] in the Court of Common Pleas of [   ] County (Exhibit P-1) who had been committed to [   ] County Prison on February 13, 1980.

3. Respondent represented [A] in a proceeding before Judge [I] of the Court of Common Pleas of [   ] County resulting in a transfer of [A] from prison to [   ] State Hospital for medical examination and treatment (Exhibits P-1; P-2) (Paragraphs 3, 4, 5 and 6 of Petition for Discipline admitted in Answer).

4. [A] was transferred from said prison to [   ] State Hospital August 7, 1980 (stipulation NT 8 and

Paragraph 7 of Petition for Discipline admitted by Answer).

5. On August 18, 1980, in the morning, respondent and [B] (father of [A]) were seen in the lobby [   ] State Hospital Admissions Building by Dr. [C], Superintendent of said Hospital (NT 91, 92).

6. Respondent told Dr. [C] he was a lawyer and wanted to see a client on the third floor Psychiatric Ward.

7. Dr. [C], using a key which was required in order to operate the elevator, permitted respondent and [B] on the elevator and directed them to the nurses' station on the third floor ward. On the third floor, Dr. [D], Staff Psychiatrist in charge of the male admissions ward and [A's] attending psychiatrist, first saw respondent and [B] in the ward approaching from the elevator.

8. Respondent and [B] introduced themselves to Dr. [D] as [A's] attorney and father.

9. Dr. [D] had no word that would warn her of the arrival of respondent and [B] (the usual procedure—NT 17) and asked several times who let them on the elevator.

10. Respondent and [B] kept requesting to see [A] and walked about halfway from the hallway into the nurses' office.

11. From that point respondent saw, in a locked room on the far side of the office, someone who waved to him and whom he knew and he walked through the office and talked to said person through the glass window.

12. Dr. [D] told respondent he had to get out of office and, as he came toward her, she said "This is the way out" and touched him in turning him toward the door to the nurses' station.

13. Respondent said "You touched me I'll have you in Court," but retreated towards open door and

Dr. [D] closed the door to the nurses' station upon respondent's foot.

14. [E], Head Nurse of the acute admission unit on Admission Three, when respondent shouted at Dr. [D] about her touching him, called security out on to the Ward.

15. Two security officers appeared on the Ward.

16. [A] was brought out from one of five seclusion rooms, with extra psychiatric aides in the area for safety, to a table with a chair.

17. Nurse [E] went back to the area where the respondent and [A] were seated and overheard some of their conversation.

18. Nurse [E] then came to the nurses' office and called Dr. [C] by phone and stated that respondent was being very supportive of taking [A] out.

19. Superintendent [C] came to the Third Floor Ward and saw six or eight employees in the ward and the respondent sitting with [A] back in the hallway alone.

20. The Superintendant walked back to where respondent and [A] were sitting and, in response to a remark of respondent, stated that the patient did not have permission to leave without orders from the court.

21. Respondent's voice, in addressing the Superintendent, was very firm but not really unpleasant and the Superintendent was unable to recall what he said.

22. The Superintendent left while respondent and [A] still were seated at the table.

23. [A], during conversation at table with respondent, complained about being locked up; about not receiving medication; about wanting to get out.

24. Respondent directed [B] to call Judge [I]; later Judge [F].

25. Dr. [D] remained in the nurses' station after

closing the door on respondent during which time she and Dr. [C] had a telephone conversation in which she referred to the existence of an "uneasy" situation on the floor and Dr. [C] stated, "Don't let anybody get hurt if he insists upon taking him let him go."

26. Superintendent [C] again came to the Ward and found respondent at the telephone in the hall and the patient talking very loudly.

27. Respondent stated he wanted to talk to the Judge and asked to use a more private telephone.

28. The Superintendent took respondent to his office on the Fourth Floor but respondent was unable to reach either Judge [I] or Judge [F].

29. While respondent was on the Fourth Floor with the Superintendent, Nurse [E] asked Dr. [D] to help get [A] back to his seclusion room in order that other patients might have their bathroom privileges and smoke breaks.

30. When Dr. [D] came out on the Ward she found that respondent was not on the floor and that [B] was attempting to get [A] to go back to his seclusion room but [A] was "oppositional" to his father and Dr. [D] thought he was about to hit his father.

31. Superintendent [C] took respondent back to the Third Floor but immediately left.

32. Respondent arrived from the Fourth Floor and saw [A] about to strike [B] and heard Dr. [D] saying "Get him out of here. He is disturbing the other patients."

33. Dr. [D's] recollection is that respondent, when he arrived back on the floor, addressed [A] stating something to the effect that you're coming with me.

34. Dr. [C], Superintendent, came back to the Third Floor Ward a few minutes after leaving respondent there and found [A] shouting profanities

and obscenities and respondent looking to him to be angry and upset.

35. The Superintendent said, "If they are going to fight their way out, don't fight them. Don't get hurt. Let them go," and he left and went back to his office.

36. It was decided [A] was going; he seemed to have made the decision.

37. Dr. [D] asked the nurse to get clothes for [A], which she did and gave the clothing to the patient.

38. [A] changed clothes but was extremely hostile toward his father so that hospital personnel were fearful that the father was going to be struck by [A].

39. Dr. [D] asked the security guards to escort the three of them ([A], [B], respondent) off the ward.

40. Nurse [E] was aware of Dr. [C's] order and believes she could only have kept the patient [A] by a battle with the patient and she did not know if respondent would help the patient or not.

41. Nurse [E] opened the door to the west exit and told the officers to escort them ([A], [B], respondent) out of the hospital.

42. During the initial incident between Dr. [D] and respondent, respondent did not push or touch Dr. [D] in any way; Dr. [D] did not seek the assistance of Nurse [E] or the aide in the office; they did not come to her assistance; neither of them had to grab or in any way touch respondent.

43. During subsequent events on the Ward, respondent did not raise his hands to anybody; did not touch anybody; did not swing at anybody. The security guards or aides did not attempt to grab him nor did anyone have to restrain him to prevent him from hitting anybody.

44. Dr. [C] did not feel it was necessary to call a code for additional assistance. He believed that the

people on hand there could handle the situation and that the staff could have prevented them from leaving if they wanted to.

45. Being in seclusion means the patient presents a serious problem to himself or to others.

46. Responsibility of hospital to keep prisoners it receives there until further notice from court, if physically able to do so.

47. Hospital, prior to events of August 18, 1980, had many escapes of persons sent there from prison (Exhibit R-7).

48. [B] and respondent did not free [A], but took [A] to the office of his personal physician, Dr. [K]. Respondent was present.

49. Dr. [K] called several hospitals in the [ ] area but there were no beds available for [A].

50. [B] and respondent took [A] to [ ] Psychiatric Hospital where [B] signed [A] in, approximately 7:30 pm on August 18, 1980.

51. Respondent returned to his office in [ ] where he found three telephone messages from his secretary referring to the [A] case.

52. The messages of telephone calls were not adequate to advise respondent of a proceeding before Judge [F] to take place the following day, August 19, 1980.

53. Respondent, on August 19, 1980, was directed by the District Attorney for [ ] County to go to Courtroom No. 2, where Judge [F] was sitting.

54. A proceeding took place before Judge [F] with a court stenographer present to record the proceedings and the district attorney present on behalf of the Commonwealth.

55. Respondent, upon inquiry, was advised by Judge [F] that the Judge had been advised on the preceding day that respondent had removed [A] from [ ] State Hospital.

56. Respondent, in response to a question of Judge [F], "Where is Mr. [A]?" replied, "I believe that—as far as I know, he's in the [   ] State Hospital."

57. At no time, notwithstanding inquiry by respondent, was respondent advised by the court of the nature of the hearing which took place during the morning of August 19, 1980.

58. During said proceeding, respondent made various statements to the effect that he did not remove [A] from the hospital; that he had no authority to remove [A] from the hospital; that [B] did not remove [A] from the hospital; that [B] had no authority to remove [A] from the hospital; and, that, "The report is true that we were at [   ] State Hospital. The report is untrue that we removed [A]."

59. Throughout the proceedings of the morning of August 19, 1980, respondent was under constant threat from the court and that the court stated, "As of this moment, sir, as far as this court is concerned, you are disbarred."

60. Respondent, in said proceeding of the morning of August 19, 1980, was not representing his client, but was defending himself.

61. Neither respondent, nor others reporting to the court, in the proceeding of the morning of August 19, 1980, were under oath.

62. Respondent in the morning of August 19, 1980, was involved in a proceeding, having the appearance of a formal hearing, in which he was not advised of any formal charges against him, but was subjected to accusations made against him without being given an opportunity to face his accusers.

63. During the proceeding in the morning of August 19, 1980, respondent's conduct was no more undignified nor discourteous than that of the court, and was not, under the circumstances, degrading to the tribunal.

64. Judge [F], after the proceedings of August 19, 1980, issued an order inter alia directing respondent to produce [A] to the [   ] County Prison no later than 7:00 pm, August 19, 1980, and suspending respondent's privilege to practice law in the [   ] Judicial District of Pennsylvania.

65. [A] was not returned to [   ] County Prison by 7:00 pm, August 19, 1980.

66. Respondent, on August 20, 1980,through his counsel, advised the District Attorney that [A] had been admitted to the [   ] Psychiatric Institute.

67. [A] was returned to [   ] County Prison by Sheriff.s deputies of said County on August 22, 1980.

68. Respondent, [   ], Esq., had a reputation, in the areas of [   ], [   ] and [   ] Counties, for honesty and integrity.

## DISCUSSION

ISSUE I: Did respondent remove [A] from [   ] State Hospital in violation of the existing court order of commitment?

The testimony of the parties indicates that the initial incident between Dr. [D] and respondent had nothing whatsoever to do with the removal of [A] from the hospital. Respondent, having come to the ward on the third floor with the knowledge and consent of Dr. [C], the Hospital Superintendent, walked into the nurses' station where he introduced himself to Dr. [D], who was in charge of the ward, as an attorney representing [A] and asked to see his client. Dr. [D], rather than acknowledge respondent's right to see his client, and suggesting that he have a seat while she sent for [A], exhibited concern only for what she considered a breach of hospital rules resulting in respondent being there without her having been previously notified. She repeatedly asked respondent by whom he was allowed on the

key-operated elevator and on the ward. Respondent, not having theretofore known the Superintendent of the hospital, was unable to answer the question specifically. The rule violation, if any occurred, obviously was the responsibility of Dr. [C], the Superintendent of the hospital who let respondent on the ward. Nevertheless, Dr. [D] definitely gave the impression that respondent had no business being there. She compounded the problem further when respondent began to talk with another patient who had waved to him from a locked room at the rear of the nurses' station, by attempting to usher respondent out of the nurses' station. Her efforts resulting in a touching of some sort of respondent by Dr. [D]; a statement by respondent that he would see her in court; a closing of the door to the nurses' station upon respondent by Dr. [D]; and, a calling of security personnel of the hospital to the ward by Nurse [E]. The treatment of respondent by the hospital, to that point in time, was less than cordial and elicited from respondent a less than cordial response.

[A] was brought from a seclusion room, where he had been kept, with additional psychiatric aides for safety. Patients were only kept in "security rooms" if they were a danger to themselves or to others. [A] was dressed in hospital pajamas while other patients were in street clothes. He and respondent sat at a table in the seclusion area. From the testimony adduced, the hearing committee concludes that the first suggestion to anyone that [A] was to leave the hospital resulted from some conversation between respondent and [A] overheard by Nurse [E] while she was intentionally eavesdropping on said conversation. She then called Dr. [C] the Hospital Superintendent, and stated that respondent was "being very supportive of taking [A] out of the hos-

pital." That respondent was "supportive" of taking [A] out of the hospital obviously was Nurse [E's] interpretation of part of the conversation between respondent and his client. Nurse [E] testified that she was not privy to the entire conversation. The purpose of the statement, if made, is unknown since respondent was dealing with a psychiatric client. Clearly, it was not an order nor a demand made upon any representative of the hospital. It was not a statement made to, or intended for the ears of, any representative of the hospital.

The Superintendent, Dr. [C], came to the Third Floor Ward for the first time after permitting respondent on to said Ward apparently after the call from Nurse [E]. He saw respondent and the patient sitting back in the hallway and walked back. He does not remember what respondent said, specifically, but he testified it was something like, "I want this man out of here now." He said that he explained that the patient did not have permission to leave the hospital without orders from the court. Respondent's voice in addressing Dr. [C] was firm but not unpleasant. Dr. [C] left the ward.

The Superintendent appeared on the Third Floor Ward again after a conversation by telephone between himself and Dr. [D] during which Dr. [D] discussed with him the fact that they had an "uneasy situation" on the floor. Dr. [C] told Dr. [D] "Don't let anybody get hurt," according to Dr. [D], the usual policy of the hospital. Dr. [C] instructed Dr. [D], "If he insists upon taking him, let him go." When the Superintendent arrived he found respondent on the telephone. He took respondent to his office on the Fourth Floor to permit him to make telephone calls after which he brought respondent back to the Third Floor Ward and left. While respondent was on Fourth Floor, Dr. [D] came out of

the nurses' office at the request of Nurse [E] for the first time since the initial incident with respondent. She found turmoil with [B] trying to get [A] to go back to his seclusion room. Both she and Nurse [E] were fearful that [A] would strike his father. Dr. [D] would have had to call an emergency code to call extra help on to the ward if she wanted to force [A] back into the seclusion room. She did nothing. Respondent arrived on the floor and Dr. [D] testified he said to [A] something to the effect of your coming with me or your leaving with me. The Superintendent came to the ward for the last time and found the patient shouting profanities. Respondent looked angry to Dr. [C] and the Superintendent stated, "If they are going to fight their way out, don't fight them. Don't get hurt." He does not remember that respondent said anything to him. He again left the ward. Nurse [E] instructed the aides to get [A's] clothing. Dr. [D] asked the security guards to escort the three of them (Respondent, [B] and [A]) off the ward. Nurse [E] testified that the decision to leave seems to have been made by [A]. She did not know whether respondent would support [A]. The security guards walked the three of them to the locked stairwell door; Nurse [E] instructed the security guards to unlock the door; the security guards walked the parties to the entrance of the hospital at the parking lot.

The events of August 18, 1980, occurred in a locked ward into which no one could enter without a key and from which no one could leave without a key, including not only the patient, but [B] and respondent. Both the Superintendent of the hospital and Dr. [D] had the power to dial a code and call for additional help. Neither did so. Both the Superintendent and Dr. [D], if there was real concern that respondent was going to take the patient from the

hospital, had the ability to attempt to reach the court of commitment. Neither made an effort to do so. The Superintendent, Dr. [D] and Nurse [E] believed that their personnel could have prevented the patient from leaving. Nurse [E] believed they would have to battle the patient. No one testified they would have to battle respondent. Nurse [E] testified that she did not know whether respondent would join patient or not. The Superintendent gave direction that, "If they're going to fight their way out, let them go." Dr. [D] stated it was hospital policy not to let anyone get hurt, and gave the order to the security guards to escort them to the locked stairwell. Nurse [E] gave the order to the security guards to unlock the stairwell door.

Testimony of hospital personnel implies, although there is no direct statement to said effect, that respondent was calling the court for the purpose of having the patient released. The inference is not readily drawn since respondent was familiar with criminal procedure and with this case in particular. He knew if the patient were released from the hospital he would be sent back to [ ] County Prison. It is much more likely that he was attempting to reach the court for a clarification of the order, as he testified.

On the other hand, there was no testimony by anyone of any order given by respondent to hospital personnel. He did not threaten to touch anyone, nor did he touch anyone. He did not threaten to strike anyone, nor did he strike anyone. He did not threaten to remove the patient by force, nor did he remove the patient by force. He did not have to be restrained by anyone, nor was he restrained by anyone. The only threat he made, to wit: "I'll see you in court," arose out of an attempt by Dr. [D] to usher him from the nurses' station. It had nothing what-

ever to do with removal of the patient from the hospital. He may have been loud, but there were times when it was necessary to be loud in order to be heard. He may have been rude, but it may have been in response to rudeness from the others— hospital personnel; [A]. The term itself represents a subjective judgment. He asked to be treated like a lawyer. Once out of the hospital, he did not release the patient but was part of a process of recommitting the patient to another hospital.

[A] clearly was a troublesome patient. He had been kept in seclusion; he was taken from seclusion with additional aides for safety; he was loud; he shouted profanities and obscenities; his behavior was such that hospital personnel and respondent thought he would strike his father; and, such that hospital personnel thought they would have to battle him to get him back to seclusion. The patient seemed to make the decision that he was leaving. Dr. [C's] direction to his personnel gave Dr. [D] an inadequate standard by which to make a judgment. Dr. [D], in light of hospital policy that no one get hurt, gave the order to security personnel to escort the patient to the locked stairwell door. Nurse [E], knowing of Dr. [C's] order and Dr. [D's] order, directed security personnel to unlock the stairwell door and escort the patient off the premises.

Respondent, [B], Dr. [C], Dr. [D] and Nurse [E] all testified that they reminded the others of the existence of Judge [I's] Order of August 6, 1980. All parties, therefore, had knowledge of the existence of the order. All hospital personnel allege that they stated that [A] could not be released unless there were a court order to that effect. But, the actions taken by said personnel were in direct contrast to that alleged stated position. They took no steps whatsoever to prevent [A] from leaving. On the

contrary, they, in effect, urged him to do so by getting his clothes, escorting him to the door, opening the door and escorting him to the parking lot. This was not the first time persons transferred there from prison had escaped. There were many prior escapes.

The hearing committee concludes that the hospital, not respondent, abdicated its responsibility for the care of the patient. The hearing committee believes that [A] was a difficult patient for the hospital to handle, causing disruption and turmoil. Perhaps the statement of Mrs. [L], on Page 6 of the Notes of Testimony of the matter before [F], President Judge of [   ] County Court of Common Pleas, in truth, represents the attitude of the hospital. She stated, after saying that she had called the hospital again, "Because the hospital said they're finished with him and they would not like [A] returned back to the hospital if he can be returned to the prison, where he belongs."

The hearing committee concludes that respondent did not remove, nor assist in the removal of [A] from [   ] State Hospital in violation of the existing court order of commitment.

ISSUE II: Did respondent, when he appeared before Judge [F], President Judge of the Court of Common Pleas of [   ] County on August 19, 1980, lie to the Judge and/or attempt to mislead the Judge in response to certain questions which were directed to him and/or allegations which were made against him?

Respondent, after leaving [A] at the [   ] Psychiatric Institute and returning to his office arrived in the early evening at a time which he reasonably believed it was not advisable to contact Judge [F]. He read through the telephone messages left by his secretary. The messages were adequate to appraise

him of the fact that he was expected to appear before the court on the following day for a hearing. On August 19, 1980, when he did appear before Judge [F] he was completely unprepared for the situation in which he found himself, to wit: Standing before the President Judge of the Court of Common Pleas of [   ] County, with a stenographer to record the proceedings and the District Attorney, [M], Esq., representing the Commonwealth. The court asked the district attorney if he was ready "on this matter." Respondent asked why he was here and was told by the court that it was advised that [A] had been removed by respondent from the [   ] State Hospital; that he left a message with respondent's office that [A] be returned to the hospital or to [   ] County Prison by 3:00 pm; and, that, since [A] was not returned, he directed respondent to appear before the court that morning. The Judge then asked respondent, "Where is [A]?" The respondent replied, "I believe that—as far as I know, he's in the [   ] State Hospital."

The hearing committee concludes that respondent, in making the foregoing statement to the court in response to a direct question regarding the same, lied to the court and/or attempted to mislead the court.

The hearing committee also finds that the balance of the statements made in the proceeding conducted August 19, 1980, before Judge [F], as set forth in, and as referred to in the petition for discipline do not constitute lies to, nor attempts to mislead, the court. The statements made to the effect that respondent did not remove [A] from the hospital; that [B] did not remove [A] from the hospital; and, that [B] had no authority to remove [A] from the hospital were not lies, nor attempts to mislead the court for the reason that respondent believed, at

the time of making said statements, that said statements were in fact true statements. The hearing committee does not disagree with that position and, as hereinbefore set forth, has found that respondent did not remove, and did not assist [B] in removing, [A] from the hospital.

Respondent, when he appeared before Judge [F] on the morning of August 19, 1980, found himself in a completely untenable position. The notes of his secretary regarding telephone messages were completely inadequate to warn him, in advance, that he would be involved in a legal proceeding of some type. The proceeding took place in open court, before the President Judge of the [ ] Court of Common Pleas, with a stenographer to record the proceedings and with the District Attorney and members of his office, apparently present to make or support allegations against respondent. Apparently nobody was sworn; the accusers were not present; the allegations were based upon hearsay; respondent was not advised of any charges made against him by the district attorney; respondent was not advised of any charges made against him by the court; and, respondent was not advised of the nature of the hearing. It was apparent, however, that respondent was no longer representing the client but was defending himself. The hearing committee concludes, therefore, that respondent was not in violation of Disciplinary Rule 7-102(A)(3), nor (4), nor (5), nor (7), nor (8), since each of these rules relates to conduct of an attorney "in his representation of a client."

The hearing committee concludes also that respondent did not violate Disciplinary Rule 7-106(C)(6) which requires that, appearing in his professional capacity before a tribunal, a lawyer shall not engage in undignified or discourteous

conduct which is degrading to a tribunal." Respondent was appearing, not in his professional capacity, but as a defendant in the proceeding which took place in the morning of August 19, 1980. Furthermore, while it is not the province of this hearing committe to make a judgment with regard to the conduct of the tribunal before which respondent was appearing, the committee is unable to read the transcript of the events which occurred that morning without concluding that the court evidenced, by its conduct and its words, its disdain for respondent and for the rights of respondent. Respondent's conduct throughout said proceeding was as dignified and as courteous as reasonably might have been expected of an attorney placed in such a completely defenseless position.

As a result of the proceedings which took place on the morning of August 19, 1980, and of a hearing held in the afternoon of said date, which hearing was then designated a hearing to determine whether there is probable cause to believe that respondent has committed an indirect contempt of court, the court issued an order which, among other things, directed respondent to return [A] to the [   ] County Prison by 7:00 pm on that date, and, suspended the privilege of respondent to practice law in the [   ] Judicial District of Pennsylvania. It was stipulated that [A] was not returned to the [   ] County Prison by 7:00 pm on August 19, 1980. The hearing committee has concluded, however, that respondent, in fact, did make an effort to comply with the said order in that he had his attorney advise the district attorney of [   ] County, on August 20, 1980, that said [A] was in the [   ] Psychiatric Institute; that it was physically impossible to comply with the literal requirements of said order; and, that having been suspended from the practice of

law within the [ ] Judicial District of Pennsylvania, respondent, at that time, was no longer an officer of the court. No evidence was presented to the hearing committee that respondent, who had not signed the commitment papers for the admission of [A] to the [ ] Psychiatric Institute, could have removed him from said hospital without the consent and cooperation of [B], who was not mentioned in said order. The only evidence available on said subject indicated, by way of stipulation, that deputies of the Sheriff's Office of [ ] County, on August 22, 1980, returned [A] to the [ ] County Prison.

## CONCLUSIONS OF LAW

Respondent has violated Disciplinary Rules 1-102(A)(4): A lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation; and, 1-102(A)(5): A lawyer shall not engage in conduct that is prejudicial to the administration of justice.

## RECOMMENDED DISPOSITION

This hearing committee [ ] recommends that respondent, [ ], be administered a Private Reprimand by the Disciplinary Board of the Supreme Court of Pennsylvania.

## ORDER

And now, May 4, 1983, the report and recommendation of hearing committee [ ] dated December 14, 1982 is accepted; and it is ordered and decreed, that the said [respondent] of [ ] County, be subjected to private reprimand by the Discipli-

nary Board of the Supreme Court of Pennsylvania as provided in Rule 204(5) of the Pennsylvania Rules of Disciplinary Enforcement at the next session of this board. Costs are to be paid by respondent.

Mr. Krawitz, Mrs. Hammerman and Mrs. Neuman dissent and would recommend a Public Censure.